LAMKIN IP DEFENSE
Rachael D. Lamkin (246066)
100 Pine St., Suite 1250
San Francisco, CA 94111
916.747.6091
RDL@LamkinIPDefense.com

*Attorneys for DJ Plaintiff*
*True Grit*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Kindred Studio Illustration and Design, LLC (aka True Grit) <br><br> Plaintiff, <br><br> v. <br><br> Electronic Communication Technology, LLC <br><br> Defendant. | **PLAINTIFF'S DJ COMPLAINT** <br><br> Case No. |

## PLAINTIFF'S COMPLAINT SEEKING A DECLARATORY JUDGEMENT AS TO NON-INFRINGEMENT, INVALIDITY, UNENFORCEABILITY, & UNLAWFUL & UNFAIR BUSINESS PRACTICES

Plaintiff Kindred Studio Illustration and Design, LLC (d/b/a True Grit Texture Supply, hereafter "True Grit") respectfully files this Complaint seeking a declaratory judgment of non-infringement, invalidity, and unenforceability as to United States Patent No. 9,373,261 (the '261 Patent), and asserts claims for Unlawful & Unfair

Business Practices under California Business and Professions Code Sections 17200.

## NATURE OF THE ACTION

1.     This is an action for a declaratory judgment of non-infringement, unenforceability, and invalidity arising under the patent laws of the United States, Title 35 of the United States Code, and for claims for Unlawful & Unfair Business Practices.  A true and correct copy of the '261 Patent is attached as Exhibit A to Declaration of Rachael D. Lamkin ("Lamkin Decl.") in support of this Complaint.

## THE PARTIES

2.     Declaratory Judgment Plaintiff True Grit is a California Corporation with its principal place of business in Los Angeles, California.

3.     Electronic Communication Technology, LLC, aka Eclipse IP, LLC ("ECT"), is a Florida Corporation with its principal address at 711 SW 24TH Boyton Beach, Florida 33435.  Eclipse IP, LLC changed its name to Electronic Communications Technology, LLC in 2015.  Upon information and belief, ECT and Eclipse IP (and all of the ECT Entities, *infra*) are, for all intents and purposes, the same shell entity.

## JURISDICTION AND VENUE

4.     This Complaint arises under the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 et seq. based on Defendant's repeated threats to sue Plaintiff for patent infringement, thereby giving rise to an actual case or controversy under 28 U.S.C. §§ 2201 and 2202.  Defendant ECT has sent to True Grit an enforcement

letter threatening litigation, (Lamkin Decl., Exh. B), and emails threatening litigation, including one sent on August 27, 2018, stating, "This will be moved into line for litigation Friday[.]"

5.     This Court also has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because the Parties reside in different states and there is more than $75,000 dollars at-issue.  True Grit has one sole member and that member is a citizen of California.  Upon information and belief, ECT has three members: Peter Sirianni, Scott Horstemeyer, and Martin Kelly Jones.  Upon information and belief, Sirianni is a citizen of Pennsylvania, Horstemeyer is a citizen of Georgia, and Mr. Jones is a citizen of Canada.

6.     This Court has jurisdiction over True Grit's claims pursuant to 28 U.S.C. §§ 1338 and 1367, and 35 U.S.C. § 271.  Should ECT attempt to avoid adjudicating the merits of True Grit's declaratory judgment claims by filing a covenant not to sue, this Court maintains jurisdiction over True Grit's state law claims based on diversity jurisdiction.

7.     This Court has personal jurisdiction over ECT, which has taken specific actions in California, including in the Central District of California.  ECT and the ECT Entities, *infra*, conduct substantial business in this judicial district, including regularly filing patent litigation, soliciting licensing revenues, and engaging in other persistent courses of conduct and deriving substantial revenue from individuals and entities in California.  ECT has contacted, at least, True Grit in California, alleging

patent infringement and seeking licensing revenues.  Moreover, this Court has repeatedly exercised jurisdiction over Eclipse IP, LLC, ArrivalStar, LLC, and Shipping & Transit, LCC (the "ECT Entities"), which are essentially the same entity as ECT.  A party may not avoid jurisdiction by changing its name.  And there are countless other actions conferring jurisdiction, *e.g.*, ECT (as Eclipse IP) filed an infringement action in this Court asserting upstream patents in the same family as the '261 Patent.  *See, e.g., Eclipse IP, LLC v. McKinley Equipment Corporation*, Case No. 8:14-cv-00742-GW-AJW.  Further, ECT (as Eclipse IP) filed thirty-six (36) patent infringement actions in this District asserting patents in the same family as the '261 Patent.

8.     Venue is proper in this Court pursuant to 28 U.S.C. § § 1391(b) because ECT is subject to personal jurisdiction in this District and a substantial portion of the events or omissions giving rise to True Grit's federal and state law claims occurred in this judicial district.

## FACTUAL BACKGROUND

### *ECT's Infringement Allegations Are Subjectively & Objectively Baseless and Asserted in Bad Faith*

9.     Plaintiff True Grit was founded in 2016 by commercial illustrator, designer and art director Andrew Fairclough.   True Grit designs and markets <u>downloadable</u> tools and assets for use by commercial graphic designers and illustrators including digital paintbrushes, stock images, software shortcuts and

tutorials.

10.     True Grit's products allow customers (other designers) to add effects and aesthetics to their designs and physical end-products that would be otherwise unachievable, commercially unviable, or require years of experience and know-how to develop in isolation.

11.     True Grits' customers include solo practitioners, small firms, and premier companies such as Nike, GAP, Google, The NFL, ESPN, IBM, 20th Century Fox, Billabong, Burton Snowboards, REI Coop, Amazon, BBC, and Nascar.

12.     Critically, True Grit's product is a digital tool delivered *via* <u>digital download</u>.  As such, any allegations of infringement of the '261 Patent (aimed at notifications for shipping products to a physical "stop" location) are both objectively and subjectively baseless.

13.     In many if not all of its campaigns, the ECT Entities use Ed Turnbull, a non-lawyer citizen of Canada, to collect the nuisance rents.

14.     Here, ECT, through Turnbull, sent an enforcement message to True Grit through True Grit's email service on its Shopify store account:

**[Remainder of Page Intentionally Blank]**

15.     The email is simply sent to "corporate" without any information that suggests it's tailored to the actual recipient.

16.     The email appears to be sent by either a bot or using a cut and paste method.  ECT would have the ability to send thousands if not hundreds of thousands of communications via this methodology.

17.     Upon information and belief, platforms such as Shopify track allegations of infringement on their platforms and can suspend a business for repeated accusations.  As such, upon information and belief, ECT's phishing campaign has harmed True Grit's business relationship with Shopify.

18.     True Grit responded to ECT's Shopify email.  True Grit received ECT's enforcement letter in the mail on August 15, 2018.  (Lamkin Decl., Exh. B.)

19.     In ECT's letter, without even ascertaining True Grit's revenue, ECT

offered to settle for a one-time, lump-sum payment of $15,000.00.  Further

evidencing that ECT's allegations are for nuisance value, divorced from the merits.

     20.    Asserted Claim 11 of the '261 Patent claims:

An automated notification system, comprising:

       one or more transceivers designed to communicate data;

       one or more memories;

       one or more processors; and
       computer program code stored in the one or more memories and
       executed by the one or more processors, the computer program code
       comprising:

            code that enables a first party associated with a personal
            communication device (PCD) to input or select authentication
            information for use in connection with a subsequent notification
            communication session **involving advance notice of a delivery
            or pickup of a good or service at a stop location** by a mobile
            thing (MT);

            code that causes storage of the authentication information;

            **code that monitors location or travel information in
            connection with the MT**;

            code that causes initiation of the notification communication
            session to the PCD with the one or more transceivers, **in advance
            of arrival of the MT at the stop location, based at least in part
            upon the location or travel information associated with the
            MT**;

            code that, during the notification communication session,
            provides the authentication information to the PCD that indicates
            to the first party that the notification communication session was
            initiated by an authorized source; and

            code that, during the notification communication session,

**enables the first party to select whether or not to engage in a communication session with a second party having access to particulars of the pickup or delivery**.

21.     As noted, True Grit's entire product catalogue consists of digital products which are downloaded by customers after purchase.

22.     True Grit does not and has not ever sold any physical product, nor any product which requires shipping or delivery by any person or shipping service.

23.     As True Grit does not offer physical products for sale, it does not provide customers with shipping data relating to transportation, delivery carriers or the movement of goods.

24.     Upon information and belief, ECT failed to conduct a competent infringement analysis before sending True Grit an enforcement letter.

25.     This is evidenced by the fact that the "screenshots" used in its infringement chart (Exhibit C to ECT's enforcement letter), were taken from the Support Page of the True Grit website: https://www.truegrittexturesupply.com/pages/support. View larger file here: https://cdn.shopify.com/s/files/1/0989/0116/files/TGTS-Download-Links.jpg?v=1534295740

26.     These are not real order confirmations.  They are screenshots of True Grit's FAQ and help folders that do not relate to shipping confirmation.  Their purpose is to educate customers as to where they can <u>download</u> their completed

purchases.

27.    Upon information and belief, ECT has intentionally edited out the portion of the screenshot that makes clear that the product is a digital download.

28.    Here is the image from ECT's infringement chart:



29.    And here are the images from True Grit's website, making clear that the product is a digital download:

[Remainder of Page Intentionally Blank]





[Remainder of Page Intentionally Blank]

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21



[Remainder of Page Intentionally Blank]

22
23
24
25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20



21   30.   In each and every one of the examples in the FAQ and in each and

22 every actual order, the confirmation makes clear that your product is a digital

23 download.

24   31.   There is simply no way to actually order a True Grit product and not

25 understand that the product is delivered via downloading, not physical shipping (and

27 not delivery, travel, stops, and notifications thereof), as is required in the Asserted
28

Claim.

32.     Further, upon information and belief, ECT appears to have actually doctored the screenshot from True Grit's website as there is no place on the True Grit's website that the customer's information and the "view your order" email appear together as represented by ECT in its infringement chart.

33.     Upon information and belief, ECT appears to have carefully edited help screens from True Grit's website in order to create a fraudulent infringement chart.

34.     A review of the True Grit database failed to proffer evidence that any person known to be associated with ECT ordered an actual product from True Grit.

35.     ECT appears to have failed to order the Accused Product, intentionally disregarded substantial evidence of non-infringement, and sent to True Grit an enforcement notice with doctored evidence.

***The ECT Entities Have A Pattern & Practice of Creating Shell Entities & Asserting Weak Patents For Nuisance Value Settlements***

36.     Upon information and belief, the owners of ECT are Peter Sirianni, Martin Kelly Jones, and Scott Horstemeyer.  The named inventor on the '261 Patent is also Mr. Horstemeyer.  The prosecuting attorney for the '261 Patent is also Mr. Horstemeyer.  This combination of owner and inventor/prosecuting attorney are repeatedly seen in ECT Entities like Eclipse IP, LLC, ArrivalStar, LLC, Shipping & Transit, LLC, and Motivational Health Messaging.

37.     Sirianni/Jones/Horstemeyer have a long-standing, oft-repeated business

model of creating underfunded shell entities and asserting weak patents in order to extract nuisance value settlements.

38.    For example, in 2004, Horstemeyer and Jones created ArrivalStar, LLC.  With Jones as the inventor and Horstemeyer as prosecuting attorney, ArrivalStar had a business practice of sending enforcement letters and filing complaints against cash-strapped municipalities in order to extract nuisance value settlements.  *See, e.g.,* https://usa.streetsblog.org/2013/06/26/apta-goes-after-transit-harassing-patent-troll/[1]

39.    ArrivalStar intentionally avoided adjudication on the merits given its knowledge as to the invalidity of its own patents.

40.    ArrivalStar continued this practice until a suit by the American Public Transportation Association ("APTA") and an investigation by the Federal Trade Commission ("FTC") forced ArrivalStar to cease its practices (or, at least forced Jones et. al. to rename ArrivalStar Shipping & Transit).

41.    The APTA's Complaint alleged, *inter alia*, that ArrivalStar intentionally filed nuisance suits for low settlement value against municipalities and transportation services because the municipalities could not afford to hire counsel for litigation on the merits.  See *APTA v. ArrivalStar*, Case No. 1:13-cv-04375-

---

[1] The undersigned and Plaintiff do not condone the use of the pejorative term "patent troll".  Insults are not productive or relevant.  Many articles and reports use the pejorative and Plaintiff's citation to same should not be seen as an endorsement of the use of the term.

ALC-SN, Dkt. No. 1.  ArrivalStar settled APTA's suit in less than 60 days, agreeing never to sue municipal transportation services again.  *See*:

https://www.citylab.com/transportation/2013/08/patent-troll-s-been-bilking-transit-agencies-finally-slinks-away/6632/.

42.     ArrivalStar filed hundreds of lawsuits and is believed to have sent thousands of enforcement letters before being forced to stop by the FTC and APTA.

43.     ArrivalStar became Shipping & Transit in 2015.

44.     Shipping & Transit has, by its own account, sent more than eight hundred (800) enforcement letters and filed more than five hundred (500) lawsuits.

45.     Recently, in *Shipping & Transit v. Hall*, Case No. 2:16-cv-06535-AG-AFM (CDCA), the Honorable Judge Guilford found:

- "Plaintiff Shipping and Transit, LLC ("Plaintiff"), formerly known as ArrivalStar S.A. and Melvino Technologies Limited, is a non-practicing entity."  (July 5, 2017, Order, Case No. 2:16-cv-06535-AG-AFM, at p.1.)

- "Although the Court agrees that filing a large number of cases does not necessarily mean Plaintiff litigated in an unreasonable manner, it nevertheless finds troubling that Plaintiff has repeatedly dismissed its own lawsuits to evade a ruling on the merits and yet persists in filing new lawsuits advancing the same claims."  (*Id.*, at 13.)

- "Considering the record of these cases and the low-value license offers,

Plaintiff's litigation history reflects an aggressive strategy that avoids testing its case on the merits and instead aims for early settlements falling at or below the cost of defense." (*Id., quoting eDekka LLC v. 3balls.com, Inc.*, Nos. 2:15-cv-541, 2:15-cv-585, 2015 WL 9225038, at *4 (E.D. Tex. Dec. 17, 2015).

- "Considering the record of these cases and the low-value license offers, Plaintiff's litigation history reflects an aggressive strategy that avoids testing its case on the merits and instead aims for early settlements falling at or below the cost of defense." (*Id.*, at 14, *quoting eDekka LLC v. 3balls.com, Inc.*, Nos. 2:15-cv-541, 2:15-cv-585, 2015 WL 9225038, at *4 (E.D. Tex. Dec. 17, 2015).

- "Plaintiff's business model involves filing hundreds of patent infringement lawsuits, mostly against small companies, and leveraging the high cost of litigation to extract settlements for amounts less than $50,000. These tactics present a compelling need for deterrence and to discourage exploitative litigation by patentees who have no intention of testing the merits of their claims. Based on the totality of the circumstances, the Court finds that this is an "exceptional" case." (*Id.*)

46.     Instead of complying with Judge Guilford's findings and Order awarding attorney's fees under Section 285, Shipping & Transit now claims to be insolvent: "Shipping and Transit, the company is insolvent and is unable to pay the

judgment." (*Shipping & Transit v. Hall, Supra,* Dkt. No. 47-1.)

### The ECT Entities & Their Owners Know Their Patents To Be Weak and The Harm Of Their Campaign To Be Extensive

47.     Sirriani/Jones/Hostermeyer (the owners of the ECT Entities: ArrivalStar, Shipping & Transit, Eclipse IP, and ECT) know the financial and emotional harm their campaigns cause to small business and the individuals who own them.

48.     Organizations such as the FTC and major investigative journalism pieces have repeatedly documented the harm the ECT Entities have cause individuals, businesses, and the economy in general.  *See, e.g.:* The Wall Street Journal, "America's Biggest Filer of Patent Suits Wants You to Know It Invented Shipping Notification," October 27, 2016 (archived at: http://archive.fo/uYbES), finding:

- "Shipping & Transit has turned its sights on scores of small online retailers and logistics startups. It typically demands licensing fees of $25,000 to $45,000, amounts just small enough to discourage a legal battle, yet painful for businesses with only a few employees."

- "'I am literally losing sleep over this,' said Pat Nastri, chief operating officer of CD Universe, an online seller of music, movies and games. The $25,000 sought by Shipping & Transit, he said, 'is one of our employees' salaries.'"

- "Despite hundreds of lawsuits filed by Shipping & Transit and its predecessor, a court has never ruled on the merits of its patent claims, according to Lex Machina. CD Universe, of Wallingford, Ct., settled last month on confidential terms. 'To fight it would have cost more than settling,' Mr. Nastri said."

- "Mr. Jones, a 55-year-old former tennis pro with no formal engineering training, estimated that Shipping & Transit and a predecessor, called ArrivalStar, have collected licensing fees from more than 800 companies and other parties."

- "Companies with under $100 million in revenue accounted for 50% of the defendants in cases filed by nonoperating companies in the first eight months of this year, up from 43% in 2015, according to RPX Corp., a firm that helps companies mitigate patent risks. It estimated that for targets of all sizes, patent demands and lawsuits cost $7.4 billion in 2015, including legal expenses."

- "'Historically, patent trolls would go after the big companies,' said Ken Seddon, chief executive of Lot Network Inc., a trade group that helps protect companies from patent suits. 'Now, patent trolls are starting to sue smaller companies because they don't have the stomach to fight back.'"

49.    In 2016, Jones and Sirianni formed Motivational Health Messaging ("MHM") based on patents prosecuted by Horstemeyer.  MHM shares the ownership structure, business address, and business model of the other ETC Entities.

*See*: https://www.eff.org/deeplinks/2018/02/startup-wont-give-motivational-health-messagings-35000-patent-demand.  Like ArrivalStar, Shipping & Transit, and ECT, MHM asserts weak allegations against unsophisticated entities in the hopes of collecting nuisance value rents.  *See id.*

50.   In 2016, the FTC released an in-depth 269-page study of patent assertion entities such as the ECT Entities.  Titled "Patent Assertion Entities: An FTC Study," the report "is based on an investigation into how the patent firms operate, and offers a detailed look at their business model, which typically involves purchasing old patents and then assigning them to shell companies that file lawsuits."  https://www.ftc.gov/system/files/documents/reports/patent-assertion-entity-activity-ftc-study/p131203_patent_assertion_entity_activity_an_ftc_study_0.pdf

51.   As the FTC explains, the business model works because the lawsuits are expensive to defend and because the shell companies don't produce anything, which makes them immune from counter-suits. According to the agency, "the behavior of Litigation PAEs is consistent with nuisance litigation."  (*Id.*)

52.   Studies show that non-practicing entities costs companies $29 billion per year in direct out-of-pocket costs.  https://hbr.org/2014/07/the-evidence-is-in-patent-trolls-do-hurt-innovation; *see also* The Direct Costs From NPE Disputes, Cornell Law Review, at:

https://scholarship.law.cornell.edu/cgi/viewcontent.cgi?article=4620&context=clr

53.     That is, 29 billion dollars per year in costs to consumers, companies, hiring, competition, and the economy.   Again, not to mention the horrific personal fear and dread that individuals feel, especially the specifically targeted and often unsophisticated small business owner, when they receive an enforcement letter or complaint from the ECT Entities.

54.     Undaunted by Judge Guilford's Order, FTC investigations, or the effect of their nuisance value campaigns on small businesses and the individuals that own them, the ECT Entities continue their campaigns.

### ECT Knows The Asserted Claim is Invalid

55.     ECT knows the Asserted Claim is invalid.

56.     For example, the claims of three other patents in the same family and sharing the same specification have been invalidated under Section 101. *Eclipse IP LLC v. McKinley Equip. Corp.,* No. SACV 14-742-GW(AJWx) (C.D. Cal. Sep. 4, 2014) (Lamkin Decl., Exh. C).

57.     The claims of the '261 Patent are indistinguishable from the claims invalidated in *McKinley* under a Section 101 calculus.

58.     As Judge Wu noted about the specification at issue in *McKinley*, which is the same specification at issue here:

- "The specification teaches in one place that a personal communications device is a broad category that includes telephones, pagers, computers, and personal data assistants ("PDAs"). '681 Patent 3:42-43.

- And in another, the specification is even more expressly sweeping:

  o Nonlimiting examples of PCDs [ ] are as follows: a personal computer (PC) capable of displaying the notification through e-mail or some other communications software, a television, a wireless (e.g., cellular, satellite, etc.) or non-wireless telephone, a pager, a personal data assistant, a navigation system in a motor vehicle, a radio receiver or transceiver, or any other device capable of notifying the user with some type of user perceptible emission. ('681 Patent 19:21-28.)

- Thus, the specification belies Eclipse's argument that the claims require a 'specially-equipped PCD.' Instead, the claims, read in light of the specification, were deliberately drafted to recite hardware in only the most generic sense." (*Id.*, at 10.)

59.     Based on the *McKinley* order alone, any assertion of Claim 11 of the '261 Patent after said order is objectively and subjectively baseless and done in bad faith.

60.     Further, all of the claims in two related patent applications, Nos. 14/590,528 and 14/592,199—claims that are indistinguishable under a Section 101 calculus—have been rendered patent ineligible by the USPTO.

61.     And while the claims of the '261 Patent issued after Judge Wu's Order, the Examiner for the '261 Patent is different from the Examiner for related

Application Nos. 14/590,528 and 14/592,199, and during the prosecution of the '261 Patent, Mr. Horstemeyer committed fraud upon the USPTO by mischaracterizing Judge's Wu's Order and failing to attach Judge Wu's Order to his AO 120 disclosure.

62.    As such, the Examiner was forced to accept ECT's misleading representations of Judge Wu's Order, e.g., that "Judge Wu was of the opinion that some (not all) of the claims of the U.S. Pat. Nos. 7,113,110; 7,064,681; and 7,119,716 were invalid under 35 U.S. C. Section 101[.]" (Lamkin Decl., Exh. D.) But Judge Wu rendered invalid each and every asserted claim. Thus, while Mr. Horstemeyer's representation to the Examiner was accurate as not all claims were asserted, its wording is artfully misleading, as all asserted claims were rendered patent ineligible. As such, Horstemeyer's representation to the USPTO ("Judge Wu was of the opinion that some (not all) of the claims of the U.S. Pat. Nos. 7,113,110; 7,064,681; and 7,119,716 were invalid under 35 U.S. C. Section 101") is intentionally misleading.

63.    Based on the Section 101 rejections in Application Nos. 14/590,528 and 14/592,199, the only reasonable conclusion is that the '261 Patent would not have issued but for Mr. Horstemeyer's misrepresentations.

64.    Further, in *Electronic Communication Technologies, LLC v. The Pep Boys - Manny, Moe & Jack d/b/a The Pep Boys*, Case No. 9-16-cv-81676 (FLSD), defendant The Pep Boys filed a motion seeking to declare Claim 11 of the '261 (the

same claim asserted against True Grit) patent ineligible under Section 101.

65.     ECT dismissed The Pep Boys with prejudice, and it appears without a settlement agreement or the payment of royalties, three (3) weeks after motion practice concluded.  This is strong evidence that ECT considers The Pep Boys' Section 101 arguments to render Claim 11 patent ineligible.

66.     Further, on September 13, 2017, the non-profit The Electronic Frontier Foundation ("EFF") sent to ECT a letter detailing multiple reasons why the Asserted Claim is invalid under Sections 101, 102, and 103.  *See* https://www.eff.org/deeplinks/2017/09/patent-troll-electronic-communication-technologies-llc.

67.     Although ECT had filed thirty-six (36) lawsuits asserting the '261 Patent alone before EFF's letter, ECT stopped filing lawsuits after receipt of EFF's letter.  This is strong evidence that ECT considers the prior art provided by EFF to be invalidating and the assertion of Claim 11 in court to justify attorney's fees under Section 285.

68.     The undersigned has spoken with other attorneys representing small businesses which have received ECT letters.  In each instance, when an attorney provides to ECT proof of invalidity, ECT simply stops contacting the attorney or his/her client.   This is further evidence that ECT is sending enforcement letters based on patent claims it knows to be invalid.

69.     ECT's infringement allegations are thus objectively and subjectively

baseless and its rent-seeking campaigns are done in bad faith, and as part of a pattern of misconduct.

70.    And yet ECT continues its campaigns.

## COUNT ONE: INVALIDITY

71.    True Grit incorporates by reference paragraphs 1 through 70 as if fully set forth herein;

72.    Claim 11 of the '261 Patent is invalid for all of the reasons stated above and attached, *inter alia*.

## COUNT TWO: NON-INFRINGEMENT

73.    True Grit incorporates by reference paragraphs 1 through 72 as if fully set forth herein;

74.    In particular see paras. 9-34, *supra*.

## COUNT THREE: INEQUITABLE CONDUCT

75.    True Grit incorporates by reference paragraphs 1 through 74 as if fully set forth herein;

76.    In particular see paras. 55-62, *supra*.

## COUNT FOUR: UNLAWFUL COMPETITION
## 17200 et. seq.

77.    True Grit incorporates by reference paragraphs 1 through 76 as if fully set forth herein;

78.    The predicate law for True Grit's Unlawful Competition claim is FTC Act Section 5, 15 U.S.C. § 45.

79.    In 2013, the FTC filed a complaint against non-practicing entity Negotiated Data Solutions, LLC, alleging harm to competition and consumers, and violations of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45.  *See*

https://www.ftc.gov/sites/default/files/documents/cases/2008/09/080923ndscomplaint.pdf.

80.     The unlawful assertion of claims that harm consumers is actionable under Section 5.

81.     The conduct of ECT and the ECT Entities amounts to an act or practice that causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition.

82.     ECT and the ECT Entities methods have a direct, substantial, and reasonably foreseeable effect on consumers.

83.     ECT has had a direct harmful effect on Plaintiff True Grit, including financial damage due to lost productivity, work time, legal costs, and its business relationship with its selling platform, Shopify.

84.     Thus, True Grit seeks all compensatory and statutory damages allowed under Section 17200's Unlawful Business Practices prong.  *See* California Business & Professions Code, Section 17200.

### COUNT FIVE: UNFAIR COMPETITION
### 17200 et. seq.

85.     True Grit incorporates by reference paragraphs 1 through 84 as if fully set forth herein;

86.     ECT is engaged in the business practice of alleging patent infringement it knows to baseless and strong-arms small businesses into paying nuisance value settlements.

87.     ECT's practice is unfair because it is unethical, oppressive, unscrupulous and contrary to public policy.

88.     Upon information and belief, ECT falsely represents that its patent has been infringed by small businesses when it knows the patent it asserts to be invalid and not infringed.

89.     ECT profited by knowingly asserting an invalid patent by receiving settlement sums from hundreds of small businesses who cannot afford to litigate patent invalidity or to be barred from sales platforms after ECT falsely alleges patent infringement.

90.     As a direct and proximate result of ECT's unfair business practice, True Grit and members of the general public have been harmed and continue to be harmed by way of lost revenue, lost productivity, and attorneys' fees.

91.     True Grit, on behalf of itself and the general public, seeks an injunction that requires ECT to immediately cease acts of unfair business acts or practices as alleged herein, and to enjoin ECT from continuing to engage in any such acts or practices in the future.

92.     True Grit and the general public also seek restitution to the extent allowable, reasonable attorneys' fees pursuant to C.C.P. § 1021.5, costs and expenses, and all other remedies permitted by law.

93.     Thus, True Grit seeks all compensatory and statutory damages allowed under Section 17200's Unfair Business Practices prong.  *See* California Business & Professions Code, Section 17200.

## **PRAYER FOR RELIEF**

By and through its undersigned counsel, Plaintiff True Grit seeks:

- An Order invalidating Claim 11 of the '261 Patent;
- An Order finding that True Grit does not infringe Claim 11;
- An injunction;

- Damages;
- Attorney's fees and costs;
- Any and all statutory remedies available under Sections 17200, 17204; and
- An Order demanding that ECT post a bond covering any eventual attorney's fees award.

Respectfully submitted,

*Rachael D. Lamkin*

Rachael D. Lamkin

*Attorneys for DJ Plaintiff*
*True Grit*